Daniel S.  Szalkiewicz, Esq.
VERIDIAN LEGAL P.C.
23 WEST 73RD STREET
SUITE 102
NEW YORK, NEW YORK 10023
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| JANE DOE,<br><br>                    Plaintiff,<br><br>        v.<br><br> RONALD DAVID INGBER and JOHN DOES 1-99,<br><br>                    Defendants. | **COMPLAINT**<br><br>Case Action No. 25-cv-5478 |

Plaintiff JANE DOE ("Plaintiff" or "JANE DOE"), by her attorneys VERIDIAN LEGAL

P.C., as and for her Complaint hereby alleges, upon information and belief, as follows:

### PRELIMINARY STATEMENT

1.      Plaintiff and defendant RONALD DAVID INGBER ("Ingber" or "Defendant")

began dating in 2018.  Though Plaintiff did not recognize it at the time, the relationship would go

on to have devastating impacts on her privacy, freedom, career, connections to friends and family,

and mental health.

2.      As this Complaint endeavors to fully describe, Ingber monitored, manipulated, and

controlled every aspect of Plaintiff's life.  From secretly installing a keystroke recorder onto her

computer and a GPS/audio recording device in her car to placing a clock containing a camera in

her apartment, Ingber's covert surveillance was extensive and inescapable.

3.      Openly, but subtly, Ingber isolated Plaintiff from her friends, family, and colleagues.  First Ingber convinced Plaintiff to move out of state closer to him, then leave her job.  When Plaintiff fell into a depression, Ingber encouraged Plaintiff to get a dog, only to take the opportunity to install additional cameras throughout her apartment.

4.      While Ingber was controlling, Plaintiff believed that he truly loved and supported her.  While Plaintiff was dealing with a situation at work, Ingber had her back, firing off accusatory e-mails to individuals he claimed were to blame.  Ingber supported Plaintiff as she underwent treatments to freeze her eggs and even paid for a portion of her niece's summer camp.  Though Ingber could be volatile, for a time, the good was enough to outweigh the bad.

5.      However, when Plaintiff attempted to leave the relationship in May of 2022, Defendant would not have it.  Soon thereafter, he convinced Plaintiff that they were both under criminal investigation for the e-mails he had sent to New Jersey officials.  Ingber persuaded Plaintiff that, without his help fighting and evading the legal system, she was almost certainly looking at extensive jailtime.  As Ingber was and is an attorney and Plaintiff believed he loved her, she had no reason to doubt Ingber's scary conclusion.

6.      Plaintiff began noticing cars following her.  Friends and family indicated receiving calls that appeared to be originating from Plaintiff which Plaintiff did not initiate.  Still others began receiving text messages from anonymous phone numbers with revealing information about Plaintiff, including her medical records.

7.      Ingber seized on this fear, telling Plaintiff there was no knowing how far the New Jersey officials would go to hurt her.  She was scared, but was comforted by Ingber's assurances that they were in this together and he would protect her.

2

8.      Meanwhile, to the outside world and Plaintiff's family, Plaintiff's mental health appeared to be in jeopardy.  Between her claims that she was under investigation, her belief that government officials were stalking her, and her insistence that someone was tracking her and accessing her electronic devices, it was easy for many to write her off as delusional.

9.      Ingber leaned into this image of Plaintiff, forging a relationship with Plaintiff's sister and confiding that the two were romantically involved and he feared for Plaintiff's mental health.

10.      Unbeknownst to Plaintiff's family or Plaintiff at the time, while Ingber was holding himself out as her only ally, he was actually the one responsible for her misery.  In reality, there was no investigation into Plaintiff, the private investigators hired to surveil her were hired by Ingber, and the hacking into and accessing of Plaintiff's electronic devices was undertaken by Ingber or someone acting on his behalf.

11.      Plaintiff attempted to move out of the apartment Ingber had rented for her on several occasions but, because of the cameras Ingber had placed in the unit, was always thwarted by Ingber or a third party sent to pressure or intimidate her into staying.

12.      Soon, Plaintiff's friends, family, and former co-workers began receiving Plaintiff's intimate images.

13.      Plaintiff finally successfully fled the apartment on November 23, 2022.

14.      Since then, Plaintiff has attempted to rebuild her life and regain some semblance of normalcy, however Ingber or someone acting on his behalf continues to text message Plaintiff and third parties overtly sexual, unnerving, and threatening messages.

15.     Despite returning to New Jersey, Plaintiff fears for her safety on a near-daily basis due to Ingber's relationship in the legal community, significant financial resources, and seemingly endless appetite for inflicting terror on women.

16.     Accordingly, Plaintiff brings this action seeking injunctive, declaratory, and monetary relief against Ingber for violations of federal privacy laws, 15 U.S.C. § 6851, [c]ivil action relating to disclosure of intimate images, the related New York Jersey nonconsensual pornography statutes, and intentional infliction of emotional distress, among other torts.

## THE PARTIES

17.     Plaintiff JANE DOE is a citizen of the County of Bergen, State of New Jersey.

18.     Defendant Ingber is a citizen of the County of Suffolk, State of New York.  Ingber's last known address is 23 Majestic Drive Dix Hills, NY.

19.     Defendant Ingber transacted business in the State of New Jersey, was aware that his actions would directly affect a New Jersey resident, and is the subject of this court's long arm jurisdiction statute.

## JURISDICTION AND VENUE

20.     This action is brought pursuant to 28 U.S.C. § 1332(a)(1) based upon Diversity of Citizenship because the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and it is between a citizen of New Jersey and citizens or subjects of a different state.

21.     This action is also brought pursuant to 28 U.S.C. § 1331, federal question, pursuant to 15 U.S.C. § 6851.

22.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the District Court of New Jersey as this is the Judicial District in which a substantial part of the events forming the basis of the Complaint occurred, where a substantial part of the evidence involved in the subject action is situated, and where the majority of the witnesses to the events forming the basis of the Complaint reside.  Furthermore, Defendant meets the requisite minimum contacts for jurisdiction in this District.

## FACTUAL ALLEGATIONS

**The Parties and Their Relationship**

23.     Plaintiff first met Defendant Ingber on a dating site in 2018.

24.     At the time, Plaintiff was thirty years old, lived in New Jersey, and was working in the field of education.

25.     Ingber was in his mid-forties, owned a home in Dix Hills on Long Island, and was a founding partner at Siler & Ingber LLP, a personal injury law firm located in Mineola, New York.

26.     Seemingly upfront, Ingber explained to Plaintiff that he and his wife were separated and in the process of divorcing but still lived together during the process.

27.     That summer and fall, the parties continued to chat online, went on dates, and even took a trip together to the Dominican Republic.

28.     Several months into the parties' relationship, Plaintiff began to receive harassing text messages from phone numbers unknown to her which said, among other things, "Got your real name and number everything available on net[,]" "Your school, family, and friends will know posting online adios whore[,]" and "Wishing you humility, disease, loss of job, and family abandonment."

5

29.    Plaintiff had never received messages like these and found them strange and off-putting.  At the time, she disregarded them as just another scam of the internet age.

30.    Plaintiff would later come to learn that this was the first of many schemes Ingber would undertake to cause Plaintiff emotional distress.

31.    Blissfully unaware of their connection to Ingber, Plaintiff continued to make the long trip to Nassau and Suffolk County whenever their schedules aligned.

**Ingber Pushes Plaintiff's Boundaries**

32.    Throughout the duration of their relationship, Ingber pressured Plaintiff to engage in sexual activities which made her uncomfortable.

33.    For instance, Ingber often encouraged Plaintiff to talk about other men while they were intimate and was outspoken about his fantasies about being a cuckold, namely watching Plaintiff have sex with another man.  Ingber repeatedly indicated a desire for he and Plaintiff to invite other men into bed but Plaintiff repeatedly refused to engage in such activities.

34.    Privately, having sex with Ingber was difficult enough.  At more than 550 pounds, Ingber had difficulty cleaning himself, causing Plaintiff to develop painful boils following sexual activity with Ingber.

35.    Recognizing Ingber was sensitive about his weight, Plaintiff attempted to help them both by assisting him in cleaning himself.  The duty was not an easy or enjoyable one, however, and, between the smells and rashes, did not encourage the sexual activity that was expected to follow.

36.    Worse yet, in April of 2019, Plaintiff learned she had contracted a sexually transmitted infection ("STI").

37.    Plaintiff immediately concluded Ingber was the one responsible for giving it to her.

6

38.     Following Plaintiff's diagnosis, she called Ingber irate about what he had done to her.  When confronted, Ingber claimed that it was Plaintiff who had given it to him, not the other way around.

39.     The two stopped speaking for several months.

40.     Ultimately, despite all the facts supporting Plaintiff's initial belief that Defendant was the source of her STI, Ingber eventually convinced Plaintiff otherwise, forgave *her*, and the two rekindled their relationship.

**The Parties' Relationship Gets More Serious and Ingber Grows More Controlling**

41.     In 2020, the parties' relationship turned more serious, with Ingber making more trips to New Jersey to visit Plaintiff at her apartment.

42.     As Ingber physically struggled to make the walk from the parking garage to Plaintiff's apartment building, he usually asked Plaintiff to retrieve his car and pull it up to the building.

43.     While Plaintiff thought nothing of this request at first, she noticed that items around her home would shift during this time – hung clothing items were on the floor, drawers and cabinets were ajar, papers askew.  Similarly, she would find e-mails she had not yet opened marked as "read[.]"

44.     Plaintiff recognized that Ingber was using this time to rummage through her apartment but said nothing, viewing it as a symptom of Ingber's insecurity about his weight. Feeling she had nothing to hide and believing it may assist him in trusting her again, she let Ingber explore her apartment.

45.     Unfortunately for Plaintiff, she did not consider that Ingber was using this time to gain access to her electronic devices, photograph her health records, and otherwise invade her privacy in ways that would make her more vulnerable to exploitation down the line.

46.     With Plaintiff working remotely due to the pandemic and the parties' relationship growing more serious, Ingber encouraged Plaintiff to move closer to him in New York, eventually renting an apartment for her in Nassau County.

47.     In 2021, Plaintiff was dealing with a work situation in which the Defendant seized on Plaintiff's disappointment, planting and fostering seeds of discontent and imploring her to quit her job and find a new one in New York.  Ingber assured her that he would support her financially until she found a new position.

48.     Ingber told Plaintiff that he believed it was due to corruption, nepotism, and politics and even encouraged Plaintiff to file a lawsuit against the New Jersey officials.  Eventually, Plaintiff began to believe him, quitting her job and, as Defendant had hoped, becoming fully dependent on him for her day-to-day survival.

49.     Ingber informed Plaintiff that he did not want Plaintiff's family to know about him until his divorce was finalized and, accordingly, provided her with a fake employment contract which would explain her ability to pay for her living expenses.

50.     Plaintiff's family believed the story Ingber had fabricated and celebrated Plaintiff's promotion.

51.     Trapped in Nassau County away from friends and family and unemployed, Plaintiff grew lonely and depressed.  To Defendant, this was just another opportunity to further poison Plaintiff against those he indicated had failed her.  Ingber began researching public officials and was emphatic to Plaintiff that extreme corruption was involved.

8

52.     Defendant was insistent that he and Plaintiff shed light on the corruption in New Jersey.  To do this, he began sending anonymous e-mails to government officials and others in power in New Jersey using an untraceable e-mail address.

53.     While Plaintiff never saw the e-mails Ingber sent, he indicated they contained information gleaned through his research into the individuals involved and proof of nepotism and corruption that was harming citizens, including Plaintiff.

54.     At the time, Plaintiff viewed the e-mails as a sign of Defendant's devotion and support.  Further, because Ingber was an attorney, she viewed his research, opinions, and conclusions as intrinsically more informed and valid.  Plaintiff believed that if someone as intelligent and well-respected as Ingber invested this much time and effort investigating the matter and deduced that corruption was at play then he must be right.

55.     Plaintiff now understands Defendant sent the e-mails as a means of further isolating her from her former colleagues and professional connections and to make it more difficult for her to find employment and return home.

**Defendant Gifts and Plants Surveillance Devices**

56.     Throughout the course of the parties' relationship, Defendant gifted, planted, or left behind items which contained tracking software, cameras, and/or recording capabilities.

57.     The first of such items was a clock which Defendant brought to Plaintiff's apartment and which she naively allowed to be placed on her television stand.

58.     The clock remained on the stand while Plaintiff and Ingber engaged in sexual activity.  When Ingber was gathering his items to leave Plaintiff's apartment, he asked that she bring him the clock.  It was then that Plaintiff noticed it contained a camera which, due to its placement, had clearly captured them having sexual intercourse.

59.    Plaintiff was irate, but Defendant Ingber sheepishly explained he had wanted a video of them for himself.  Plaintiff made him leave with the clock and warned Ingber that she did not want to see it again.

60.    Defendant additionally left a dual port phone charger plugged into Plaintiff's car's cigarette lighter and casually indicated that Plaintiff could keep it.  For months Plaintiff thought nothing of this tiny but useful item, but would eventually come to learn it was being used to track her whereabouts by GPS and record the audio in her car.

61.    Indeed, Defendant used the audio captured while Plaintiff was in her car to intervene prior to her attempted move outs and the GPS tracker to provide her whereabouts to the private investigators he hired to follow her.

62.    While Defendant eventually gained access to Plaintiff's Google account and e-mail, he also installed a keystroke tracker on Plaintiff's laptop to track her activities on other websites.

63.    Finally, upon information and belief, Defendant or someone acting on Defendant's behalf began interfering with Plaintiff and her sister's cell phones enabling him to view outgoing and incoming phone calls, delete photographs, and access and delete other content.

**Plaintiff Attempts to Leave the Relationship**

64.    Plaintiff began to realize how much power and independence she had lost since moving to New York.  She had left behind her friends and lied to her family about being employed. The mere suggestion Plaintiff would leave New York – even to visit her family in New Jersey – would lead to fights with Ingber.

65.    Plaintiff expressed to Ingber, on multiple occasions, that while she cared and loved him, she could not imagine a future with him.  Ingber largely ignored Plaintiff's reluctance and always talked her into staying.

66.     In March of 2022, he recommended and bought Plaintiff a dog to lift her spirits. With the dog, however, came the cameras.  Ingber said this was for the dog's health and safety.

67.     Unfortunately, even a dog could not shake Plaintiff's feeling that she was stuck in a loveless relationship.

68.     Plaintiff attempted to move out of the apartment on no fewer than four occasions but, because of the cameras in her apartment and recording device in her car, Ingber was always one step ahead of her.  Each time she attempted to leave, she was stopped by Ingber or someone associated with Ingber.

69.     When Ingber would appear, his strategy was to accuse Plaintiff of only loving him for his money then manipulate, plead, and say whatever needed to be said to convince Plaintiff to stay.

70.     When Ingber's employee Matthew Happaney intervened, however, Plaintiff was informed that anything that was left in her apartment would be gone forever.  By this point, Plaintiff was estranged from her friends and family and felt she had no place to call home.  Her belongings were all she had.  With only one small car in which to flee, she stayed.

71.     Plaintiff felt trapped but, having distanced herself from her family and friends back home in New Jersey, she convinced herself that staying with Ingber was her best option.

**Ingber Invites Plaintiff's Family to His House**

72.     While Plaintiff was aware Ingber was married, he always assured her that he was in the process of divorcing his wife.

73.     As Plaintiff was friendly with Ingber's wife, Amy, as well as his two young sons, Plaintiff had no reason to doubt this.

74.     Indeed, Plaintiff went on multiple vacations with Ingber and his kids.

11

75.     But even with Ingber's wife and children welcoming Plaintiff into their family, Ingber was resistant to Plaintiff's friends and family learning about their romantic relationship. He concocted documents and elaborate stories to aid Plaintiff in convincing third parties of this.

76.     Accordingly, when Ingber suggested she invite her family to his home for Memorial Day in 2022, she was pleasantly surprised.

77.     Ingber's invitation, however, came with a catch: he was to be introduced as a friend and nothing else.  Despite these parameters, Ingber seemed genuinely excited to meet Plaintiff's family.

78.     That weekend, Plaintiff's brother, sister, niece and nephews, and parents all visited Ingber's house.

79.     Thereafter, Ingber indicated that he would pay for half of Plaintiff's niece's summer camp if she attended Crestwood Camp in Melville, New York.  Plaintiff extended the offer and her sister gladly agreed, believing reimbursement was being offered by Plaintiff's "employer" rather than Ingber.

80.     That summer, Plaintiff's sister and niece resided at Plaintiff's apartment in New York for a month as Plaintiff's niece attended camp nearby.

81.     During this time, Plaintiff's sister got to know Ingber and, unbeknownst to Plaintiff, was aware that Plaintiff and Ingber were in a romantic relationship.

82.     While Ingber had been representing to Plaintiff that she would be moving into his home by December 1, 2022, he had confided in Plaintiff's sister that he had no intention of doing this as he believed Plaintiff's mental state to be in jeopardy and did not want to be viewed as the "bad guy[.]"

83.     On July 5, 2022, while Ingber was driving, Plaintiff told Ingber that their relationship had run its course and she wanted to return home.

84.     Ingber was furious, banging on the ceiling of his car and seemingly unable to control his rage.  Plaintiff exited the car with her dog, leaving her phone in the center console.

85.     When Plaintiff returned to retrieve her phone, both the phone and Defendant were gone.  Plaintiff watched on "Find my iPhone" as Defendant took Plaintiff's phone back to his office where, upon information and belief, he backed up Plaintiff's entire phone using iMazing.

86.     Despite it being clear that Defendant had taken her phone, Defendant began claiming that it had been stolen by a third party who drove away with it to Hempstead, New York.

87.     Ingber later admitted he took Plaintiff's phone and placed it in a mailbox to support his fake story about theft.

88.     That afternoon, however, when Plaintiff and her sister returned to her apartment, Ingber was already inside. The two fought about what Ingber had found on Plaintiff's phone and Plaintiff wanting to leave.

89.     After hours of arguing, Ingber convinced Plaintiff to stay in the apartment until September, pleading with her that she "owed" him the summer.

**Ingber Claims New Jersey Prosecutor's Office is Investigating E-Mails**

90.     Within days of the fight and Ingber's theft of Plaintiff's phone, Ingber began claiming that he had received an e-mail from a Prosecutor's Office in New Jersey pertaining to the e-mails he had been sending alleging corruption and nepotism in the county.

91.     Plaintiff received no such e-mail in her inbox but was instead sent a screenshot by Defendant Ingber.

92.    The e-mail from the prosecutor stated "It has been brought to my attention that an alleged crime has taken place.  Please contact me."

93.    At the time, Plaintiff fully believed in the legitimacy in the e-mail and Ingber was all too happy to explain the serious criminal consequences Plaintiff faced if third parties believed she was involved.

94.    Soon thereafter, on July 18, 2022, e-mails were sent to several people that contained hyperlinks implying Plaintiff was a prostitute - which, upon information and belief, also contained intimate images of Plaintiff.

95.    Plaintiff's mental health spiraled.  Ingber had convinced her that the federal government was pursuing her criminally.  As Ingber was an attorney and had personally sent the e-mails, placing himself at risk, Plaintiff had no reason to doubt him.

96.    Ingber began telling Plaintiff that he had started setting aside money for them both to flee the country to avoid criminal prosecution.  Ingber informed Plaintiff that if they were married they could not be forced to testify against one another due to spousal privilege.

97.    Ingber instructed Plaintiff to change her phone number so the authorities would not be able to track her.  He further told Plaintiff that it was only safe for her to visit New Jersey on Sundays as it was the only day a subpoena could not be served upon her.

98.    Ingber urged Plaintiff to use his EZ-Pass, claiming New Jersey officials – or someone even more dangerous – were likely tracking Plaintiff's EZ-Pass and would be notified of her entering New Jersey if she used her own.

99.    That month, Plaintiff lost ten pounds due to the crushing stress of impending criminal prosecution.  Plaintiff's sister, who was staying with her, watched as Plaintiff showed signs of paranoia, depression, and anxiety.

100.    Plaintiff's sister began to believe Ingber's claims that Plaintiff's mental health was in jeopardy.

101.    Though Plaintiff was not aware of this at the time, upon information and belief, Ingber never actually received a message from the prosecutor's office and manufactured it himself for the purpose of scaring Plaintiff into staying with him to protect herself.

102.    Similarly, Defendant eventually confessed that he was the individual responsible for the e-mail blast.  Defendant justified his behavior as being fair retaliation for Plaintiff talking to other men – something he had confirmed after stealing Plaintiff's phone.

**Plaintiff Confides in her Sister, Again Attempts to Flee**

103.    On July 23, 2022, Plaintiff, who was on the verge of a mental breakdown due to stress, told her sister everything.  Thankfully Plaintiff's sister was able to deduce that Ingber was responsible for it all and began to believe he was a human trafficker.

104.    The two women went to bed with the intention of spending the next day packing and moving Plaintiff out of the apartment.

105.    The following morning, however, Ingber was at Plaintiff's door at approximately 8:00 a.m.  Ingber claimed to Plaintiff's sister that he feared Plaintiff was suicidal and had come over to check on her.  He urged Plaintiff's sister to check Plaintiff into a mental health facility.

106.    Plaintiff's sister appeased Ingber, telling him she agreed and planned to do just that.  When he left, the two women continued their plan to get Plaintiff out of the apartment and back home to New Jersey.

107.    As Plaintiff fled New York, Ingber called and texted her repeatedly, threatening to contact her friends and demanding that she return their dog.  Defendant indicated that he and others were able to track her through her dog's microchip.

15

108.    While Plaintiff's sister's conclusions about Ingber rang true, a part of Plaintiff still believed Ingber.  If Ingber was right, her return to New Jersey would likely get the attention of very powerful people who wanted to hurt her.

**Defendant Convinces Plaintiff Investigators Are Closing In**

109.    Indeed, almost as soon as Plaintiff returned to New Jersey, she began spotting the same car following her from place to place and sitting on her sister's block.

110.    Days later, Ingber was still contacting Plaintiff.  He claimed that he had hired an IT professional from Stetson Cyber Group named Brian Busto who learned that private investigators in New Jersey had, in fact, been hired to surveil Plaintiff.

111.    The information resonated with Plaintiff and, in her eyes, made Ingber more credible.

112.    Before long, Plaintiff's family began to realize cars were following them as well. When Plaintiff's brother drove her car, he noticed the same vehicle following him.  A few weeks later, Plaintiff's sister began noticing cars were following her as well.

113.    Plaintiff began to think that perhaps Ingber was right all along and she had just walked into a trap.

114.    At her sister's urging, Plaintiff and her sister hired a private investigator who confirmed that the individuals following them were, in fact, other private investigators.  As the sisters did not learn who had hired the investigators, the discovery confirmed Ingber's representations once again making him seem more credible.

115.    Plaintiff continued to speak and meet with Ingber, believing they were both victims in whatever surveillance was happening.

16

116.    When Plaintiff's sister found out the two were speaking, she was furious and kicked Plaintiff out of her house, driving her back into the ever-deceptive arms of Ingber.

**Plaintiff's Intimate Content and Medical Information is Sent to Family, Friends, and Colleagues**

117.    In November 2022, over a period of approximately two weeks, more than a dozen intimate images depicting Plaintiff were texted to Plaintiff's friends, family, and colleagues.  In addition to the intimate images, the messages contained sexually graphic text message conversations as well as medical records showing that Plaintiff had been diagnosed with a sexually transmitted infection.

118.    Using anonymous phone numbers, Ingber or someone acting on his behalf sent Plaintiff's intimate content, on multiple occasions, to Plaintiff, Plaintiff's sister, mother, sister in law, cousin, aunt, multiple friends from childhood and/or high school, co-workers (including her former vice principal and his wife), no fewer than three friends, multiple ex-boyfriends, and an ex-boyfriend's wife.

119.    The messages were sent using anonymous phone numbers, but Ingber insisted they were being sent by New Jersey officials.  One of the messages demanded payment of ten Bitcoin for the messages to stop.  In an effort to be seen as Plaintiff's savior, he offered to make the payment.

120.    Plaintiff was well past her breaking point but refused to become further indebted to Ingber.

121.    Ingber permitted Plaintiff to visit her parents in Florida in October 2022.

122.    During this trip, Plaintiff's sister and mother aggressively attempted to deprogram Plaintiff and open her eyes to what was clear to third parties: she was not being pursued by New

17

Jersey officials and the person behind the private investigators and harassing text messages was Ingber.

123.    On November 23, 2022, Plaintiff's sister and mother were finally successful in convincing Plaintiff to leave Ingber once and for all.

**Ingber's Access to Plaintiff and her Sister's Devices**

124.    Upon information and belief, at some point in 2022 Ingber gained access to Plaintiff and her sister's cellphones and/or iCloud accounts.

125.    In late-November of 2022, Plaintiff's sister's phone began glitching and shutting down while she was on the phone with Plaintiff.

126.    Plaintiff also found that her phone could no longer keep a charge for more than a couple hours, would frequently glitch, and kept deleting photographs and messages at random.

127.    Both Plaintiff and her sister purchased burner phones but, on multiple occasions, these also got hacked, once less than 24 hours after purchase.

128.    Though Plaintiff did not provide him with such access, Defendant Ingber at some point gained access to her Google photos as well as her Google conversations.

129.    Upon information and belief, this is how Defendant gained access to more than thirty of Plaintiff's intimate images which he would then go on to send to dozens of people, including Plaintiff's friends, family, and colleagues beginning in November of 2022.

**Ingber Utilizes Spoofing to Harass**

130.    In possession of the complete contents of Plaintiff's phone as well as a live view of what she was doing and with whom she was speaking, Ingber would routinely text and call people with whom Plaintiff had been speaking only moments earlier.

131.    Plaintiff's friends and family often informed Plaintiff that, immediately after getting off the phone with her they would begin receiving spoof calls which appeared to be associated with someone Plaintiff knew or Plaintiff herself.  When her friends and family answered, however, no one was on the line.

132.    Upon information and belief, Ingber or someone acting on his behalf was initiating the calls as a means of intimidating and retaliating against Plaintiff.

**Friends and Family Cut Off Contact to Avoid Harassment**

133.    Because everyone who remained in Plaintiff's life involuntarily found themselves within Ingber's web of harassment, one by one they cut off contact with Plaintiff.

134.    Longtime friends distanced themselves as Plaintiff's life crumbled, both to avoid the nuisance of Ingber's spoof phone calls and vile text messages but also to protect themselves should he have the ability to gain access to their devices as well.

135.    Plaintiff's former boss blocked Plaintiff for fear that any communication with her would lead to more intimate content being sent to both him and his wife.

136.    Because Ingber often contacted individuals via their publicly available professional e-mail addresses, Plaintiff's friends and family worried they would suffer professional consequences due to their receipt of the intimate and/or sexually graphic content.

137.    Many individuals who Plaintiff once considered close no longer speak to her due to Ingber's conduct.

138.    As a result, Plaintiff believes that Ingber may have harassed other friends of hers who have not come forward as they wish to remain uninvolved.

**Deprogramming Plaintiff**

139.    Plaintiff's family worked tirelessly to force Plaintiff to view her life through a more objective lens and reexamine the claims which Ingber had been feeding her.

140.    First and most obviously was the matter of impending criminal prosecution. Plaintiff's family reminded her she was not involved with sending the e-mails about New Jersey officials, that she never even saw them, that she had never received an e-mail from any prosecutor, and that she had only seen a screenshot of an e-mail which had purportedly been sent to Ingber.

141.    Relatedly, Plaintiff's family forced her to think rationally about what Ingber could possibly have sent that would cause private investigators to follow her, lead to a lifetime in prison, and make fleeing to a non-extradition country reasonably necessary.

142.    Gradually, Plaintiff came to realize that every part of this storyline, from the initial sending of the e-mails to the message from the prosecutor was within Ingber's control.

143.    Plaintiff realized that the excuses she had made for Defendant – that he was kind, that he was also a victim, that he was controlling because he was self-conscious about his weight, that he just wanted what was best for her – were not so much her own as they were Ingber's.

144.    Little by little, Plaintiff began to process that Ingber was not in her Google account because he wanted to help her find the best data storage deal, but because he wanted to monitor her.  He was not ransacking her apartment because he was insecure, he was ransacking her apartment because he was gathering information and access which he could then use down the line to hurt her.

145.    Plaintiff began to realize that the only person who had access to her intimate content, the wherewithal and means to send it anonymously, and the motivation to do it was Ingber.

146.    Plaintiff now understands that the individual who had been assuring her for months that he was the only one who could save her was really the reason she was being followed and harassed in the first place.

147.    While the truth has been liberating, the damages will be lifelong.

**Plaintiff and Others Alert Police; Ingber Continues to Harass**

148.    Plaintiff has reported Defendant's conduct to the police on multiple occasions. One of her first reports was related to cars following her in New Jersey.

149.    Later, Defendant reported Defendant's dissemination of intimate conduct.

150.    On March 31, 2023, Plaintiff's sister reported receiving a 1099 tax form from Ingber's company, Siler and Ingber, despite never providing Ingber with her social security number and never working for Ingber or Siler and Ingber.

151.    Ingber had requested Plaintiff's sister's social security number on numerous occasions from both Plaintiff's sister and Plaintiff but both women declined to provide it to him.

152.    Upon information and belief, Ingber obtained the social security number at some point during his accessing of Plaintiff's iCloud, e-mail account, or some other electronic device.

153.    The Police Department produced an incident report indicating same.

154.    On January 9, 2023, Plaintiff's ex-boyfriend A.H. also went to the police to report Defendant's bad conduct.  The Police Department provides, in pertinent part, that A.H.

> received four indecent photographs, via text message, from phone number 908-882-4215.  The photos included a photograph of him laying on a couch naked and asleep.  [A.H.] stated that this photograph was taken

eight years prior by his ex-girlfriend, [Plaintiff]. The three remaining photographs were of [Plaintiff], which were a photo of her vagina, a photo of her in bondage, and a photo of her crying. [A.H.] stated that the same evening [Plaintiff's] sister and mother received the same photographs…[A.H.] stated that [Plaintiff] had been harassed by her ex-boyfriend, Ronald Ingber, and he believed that Ingber was involved in this incident. During the course of their relationship, Ingber had uploaded all the contents that were saved on [Plaintiff's] phone, which included the above-mentioned photographs. After [Plaintiff] ended her relationship with Ingber, [Plaintiff] and [A.H.] began to receive multiple calls from blocked numbers. [A.H.] stated that he used an application on his phone that revealed the calls were from Ingber…[A.H.] completed an affidavit, which was also attached to this report.].

155.    A.H.'s police report came just days after Ingber mailed a letter to L.P., an individual who was adverse to A.H. in a legal matter concerning medical malpractice. The letter stated:



156.     The letter mentioned both Plaintiff and A.H. by name.  It alleged that A.H. was engaging in sexual misconduct with patients and stated that Plaintiff was feeding confidential information to A.H.  The letter, though unsigned, untraceable, and clearly not sent by any government agency indicated the "investigation in the Matter of [A.H.] is ongoing and must remain confidential…[w]e intend to explore [Plaintiff's] involvement and believe she may be obstructing justice.  Keep in mind the information you possess may cause damages and jeopardizes a fair outcome."

157.     Ingber's harassment of A.H., including by sending his naked images to third parties, calling and text messaging him using fake numbers, and attempting to meddle in legal matters so as to jeopardize his professional career weighed heavily on A.H.

158.     A.H. devoted time and resources toward confirming Ingber was responsible for contacting him and, ultimately, was able to find evidence linking Ingber to the harassment.

159.     A.H.'s mental health deteriorated and he committed suicide four months after making the police report against Ingber.

160.     While the detectives have been reviewing Plaintiff's laptops and phones as well as the recording device she discovered in her car and routinely indicate the impending involvement of the District Attorney's office and/or that they intend to obtain search warrants for Ingber's devices, no action as of yet has been taken against Ingber and Plaintiff continues to be harassed. However, the investigation is still ongoing.

161.     Despite breaking up in 2022, on September 7, 2024 Defendant contacted Plaintiff using an unknown phone number stating: "Feee tonite?  Kinda horny maybe I'll come over with a bottle[.]"

162.    When Plaintiff informed the unknown number they had the wrong number, Defendant made certain Plaintiff knew this was not innocent contact, providing the name of the employer at which Plaintiff now worked and her last name.

163.    More hauntingly, two days later on September 9, 2024 soon after Plaintiff exited her workplace, she received another text message from the same number stating "You look cute today[.]"



164.    Upon information and belief, Defendant Ingber has again hired private investigators to follow and surveil Plaintiff or, at the very least, wants Plaintiff to believe he has.

165.    Despite the passage of time, Defendant's messaging of Plaintiff has continued.  In December 2024, Plaintiff received the following string of text messages, including one which used her last name and another calling her a "ho ho ho":



166.    The messages continued through the New Year, with messages including "HO

HO HO Hoboken" on December 27, 2024; "Giddy and dirty @4" on December 10, 2025; "Sissy

and dirty after class?" on January 17, 2025; and "@ teteboro Atlantic terminal Dep at 8:30 am"

on February 1, 2025 all from the same (914) 528-4233 number.

167.    Plaintiff is tired of hiding from Ingber and desperately seeks the ability to move

through her life freely and without the constant fear that he is tracking her.

**Ingber Contacts Plaintiff Through Legitimate Phone Number**

168.    On April 22, 2023 Plaintiff worked up the courage to begin online dating again.

The same day Plaintiff was messaged by Ingber posing as another man.

169.    Plaintiff engaged in polite conversation with the man – now known to be Ingber –

and even spoke with the man on the phone.

170.    The man, howevercombative in text messages, writing that Plaintiff seemed like she was on "many apps serial dating or not over [her] ex."  He told Plaintiff "[w]hen you're ready to explore 1 real man let me know."

171.    Days later, the man was still contacting Plaintiff, writing:

- Sweetness
- What's your problem? Seriously you begged to text don't like what I say then go silent come on sweetness.  I'm going to run your number.
- Why so cold
- Or did you reach out to ex? I'd respect that and vanish
- You wanted to get off site and to text.  Sorry to discuss past.  Sounds like trauma.  Anyway
- Is [Plaintiff's nickname] your real name?
- I'll remove you. Number came up owned to [Plaintiff's sister's name]
- You're fake all around. Nice to meet you [Plaintiff's sister's name]
- I'll see if any of my pals recognize you from their SA experiences. Grabbed your profile before you deleted.  Curious cat now.
- I'll put your information and photos on the message board to see what others say.  We men have to watch out for scammers like you.  You already destroyed your ex hid knows how many men you fucked up.

172.    The text messages were sent from (646) 574-1062.

173.    (646) 574-1062 is a Verizon Wireless cell phone number which, at the time, was registered to Ronald Ingber at 301 Mineola Blvd, Ingber's office address.

174.    Upon information and belief, Ingber used a device to mask his real voice when he spoke with Plaintiff.

175.    Before long, Plaintiff, her sister, and father were being inundated by messages from (646) 574-1062 and other spoof phone numbers with screenshots of her dating profile, sexual propositions, and other vile communications, including:

- Give a NY number but you're from Bergen County look you up and bunch of names and numbers. You're what's wrong with site. Sell your ass and exploit daddy to pay for Italy PR Montauk Boston and what your brook ass mental case cant. Move out in fall and have daddys tap it cause without your zero. B a life time SB. Looking for you where you at. woot woot.  Want to earn that 1g

26

- [Plaintiff and Plaintiff's family member's names] its your daddy from seeking. Got a hotel tonight before the boro ride. Got 1 g let's get dirty [eggplant emoji]…You got off so hit you on all numbers affiliated with yours and address. Don't know if you still got harassed. I'll be downtown at 6…Jersey girl what gives you're here seeking an arrangement then poof…
- Is your name [Plaintiff's sister's name] or [Plaintiff's name]?  Which number is real? Still waiting to sponsor you.

176.    Prior to deleting her profile, Plaintiff was also being contacted by Ingber posing

as other men as well as one profile which contained a heavily edited image of Ingber with the

following details about him:

> About Me
> I am out of a sexless marriage where we have mutual respect and co-habituate for the children with an understanding.  I am the real deal and not the person you would expect on this platform.
> I've had an arrangement before that morphed into the most incredible friendship and relationship.  We began casual, she pursued me for a long time, and it became serious believing she wanted to start a family.  It was an amazing long term relationship which I devoted my heart and went all in thinking I'm going to spend the rest of my adult life with her.
>
> You may ask why it ended. Her life of lies, swelling and deceit caught up with her. As to us, our arguments were over: 1. Her issues with prior employment; 2. My suspicions which were rebuked with I'm controlling and jealous (turns out she was cheating during the entire 4 years with multiple men); and 3. My weight (she wasn't perfect and had scars, etc) instead of beating her up over her flaws and imperfections I'd support and accept her as is.  Funny thing is I never saw the imperfections that's how I knew I was in love.  I thought she was the one.  I believe in loving a person inside out and am not vain-life is short and what's inside truly is what grows and lasts forever.
>
> NEVERTHELESS, I believed we were in love and a committed relationship, and while I went to work she was on the couch, dwelling on her past, surfing dating apps, lying to the world on social media, and intimate with others throughout our relationship (even in our bedroom) instead of being present.  I was the loyal partner who provided laughter, a wonderful lifestyle, attentive friendship, constant love, and more.  Turns out I was an ATM while she cheated (from day 1).  While I am devastated losing my greatest friend, and it hurts every single day, I have spent months focusing on myself, losing weight and reminding myself the amazing life I've built and dodged a bullet 100 ways.  I remind myself daily she couldn't have loved me or been a friend, cause that person

doesn't cheat and lie for 4 years gaslighting. I allowed someone culturally different into my world, (provided her everything from a home, vacations, nicest restaurants, custom clothing, salary for a no show position, etc.) but when confronted she always shifted the guilt on me, never took responsibility and always deflected blaming me saying I'm controlling, jealous or insecure what we know as emotional manipulation while the entire time she lied to her family and friends, sleeping with multiple partners while I supported her, listening to her words of wanting my hand forever including children and marriage together. I was fooled. I'd go to sleep she's texting other men scheming ways to meet, even inviting another man into our bed. Turns out my intuition was right, while she moved into a home and had credit card I paid, she was sleeping with others and lying to each one of them. Imagine she asked for Yankee suites to take a friend only to sleep with him an hour before the game. Here I thought I was being a generous partner. Shameful. I gave my all and was so close to making the biggest move of my life. I've been tested 4 times since it ended and have not slept with anyone. I'm not here to meet just anyone. I'm looking for someone special who mentally engages me and would like to establish a one of a kind friendship.

I'm ready to move past this disgusting human being and hope to meet a sweet kind genuine activity partner to go biking, swimming, boating, golfing, traveling, and wine tasting this summer. Trips may include Italy, Napa, Maldives to name a few. I only ask for honesty which I did not receive an ounce of in the past. Only respond if you're looking for a real genuine connection.

177.    Ingber's appetite for contacting and harassing Plaintiff and her family is seemingly insatiable and has caused Plaintiff to fear and question the motivations of new people out of concern that they are truly Ingber.

**Permanent Damage Caused by Ingber**

178.    Even though Plaintiff is no longer trapped in the apartment Ingber rented for her, she will forever be haunted by the relationship.

179.    First, as previously indicated, Defendant left Plaintiff with a sexually transmitted infection.

28

180.    Second, due to Plaintiff's low egg count, Plaintiff twice underwent the egg freezing process but, because of the enormous stress she was under at the hands of Ingber, the process was not successful.

181.    As a result, Plaintiff is now in her mid-thirties and may have lost her ability to have biological children.

182.    Third, Plaintiff's relationships with friends, family, and colleagues have forever been impacted by Defendant's sending of Plaintiff's intimate content as well as other harassment he has forced them to endure.

183.    Fourth, Plaintiff's professional prospects have suffered as a result of Defendant's manipulation and e-mail harassment and Plaintiff has struggled to finish her educational courses due to the stress she endured and continues to endure.

184.    Fifth, the impact which Defendant has had on Plaintiff's mental health has been devastating.  Plaintiff was gaslit and manipulated by Defendant for years and still struggles with coming to terms with the life experiences she lost believing Defendant's lies.  More so, Plaintiff continues to receive bizarre messages and phone calls which she believes to be initiated by Ingber or someone acting on his behalf.

185.    Finally, Plaintiff remains in fear for her physical safety.  Plaintiff is afraid of living alone and entertains serious concern that Ingber would cause physical harm to her and/or members of her family.


**FIRST CAUSE OF ACTION**
**(Violation of 15 USC § 6851)**

186.    Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

187.    Defendant disclosed Plaintiff's intimate images through e-mail and text messages using his cell phone/computer.

188.    The images disclosed by Defendant depicted Plaintiff's uncovered genitals, pubic area, anus, and/or nipples.

189.    Plaintiff was identifiable in the images by virtue of her face being visible and/or by text accompanying the messages.

190.    Defendant did not obtain Plaintiff's consent to disclose the images to Plaintiff's family members, friends, and colleagues.

191.    Defendant knew that Plaintiff did not consent to the disclosure of the images to third parties.

192.    As a result of Defendant's conduct, Plaintiff has been damaged.

193.    Plaintiff demands judgment for any actual damages which exceed the jurisdictional limits of all lower courts which would have otherwise have jurisdiction of this matter, but not less than $150,000.00, together with damages for pain and suffering and punitive damages, attorney's fees, costs of this litigation, injunctive relief preventing Defendant from disseminating the images, and such other relief as the Court deems equitable and just.

### SECOND CAUSE OF ACTION
### (Violation of N.J.S.A. 2A:58D-1)

194.    Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

195.    New Jersey Statute 2A:58D-1 states:

a. An actor who, in violation of section 1 of P.L.2003, c. 206 (C.2C:14-9), photographs, films, videotapes, records, or otherwise reproduces in any manner, the image of another person who is engaged in an act of sexual penetration or sexual contact, the exposed intimate parts of another person,

30

or the undergarment-clad intimate parts of another person shall be liable to that person, who may bring a civil action in the Superior Court.

b. An actor who, in violation of section 1 of P.L.2003, c. 206 (C.2C:14-9), discloses any photograph, film, videotape, recording or any other reproduction of the image of another person who is engaged in an act of sexual penetration or sexual contact, the exposed intimate parts of another person, or the undergarment-clad intimate parts of another person shall be liable to that person, who may bring a civil action in the Superior Court. For purposes of this section: (1) "disclose" means sell, manufacture, give, provide, lend, trade, mail, deliver, transfer, publish, distribute, circulate, disseminate, present, exhibit, advertise, offer, share, or make available via the Internet or by any other means, whether for pecuniary gain or not; and (2) "intimate parts" has the meaning ascribed to it in N.J.S.2C:14-1.

c. The court may award:
(1) actual damages, but not less than liquidated damages computed at the rate of $1,000 for each violation of this act;
(2) punitive damages upon proof of willful or reckless disregard of the law;
(3) reasonable attorney's fees and other litigation costs reasonably incurred; and
(4) such other preliminary and equitable relief as the court determines to be appropriate.

A conviction of a violation of section 1 of P.L.2003, c. 206 (C.2C:14-9) shall not be a prerequisite for a civil action brought pursuant to this section.

196.    The photographs disseminated by Defendant show Plaintiff performing a sexual act and/or show Plaintiff's intimate parts.

197.    Defendant distributed the pictures to Plaintiff's family members and friends.

198.    Defendant has violated New Jersey Statute 2A:58D-1.

199.    As a result of Defendant's actions, Plaintiff demands judgment for any actual damages which exceeds the jurisdictional limits of all lower courts which would have otherwise have jurisdiction of this matter, together with damages for pain and suffering and punitive damages, attorney's fees, costs of this litigation and such other relief as the Court deems equitable and just.

## THIRD CAUSE OF ACTION
### (False Light Invasion of Privacy)

200.    Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

201.    Plaintiff had an interest in not being made to appear before the public in an objectionable false light or false position, or in other words, otherwise than she is.

202.    Despite Plaintiff's interest, Defendant publicized information about Plaintiff's private life, specifically claims that she is a prostitute, by sending blast e-mails to numerous individuals.

203.    The allegations made by Defendant have the capacity to give rise to a false public impression of Plaintiff.

204.    The allegations Defendant made about Plaintiff so misrepresented Plaintiff's character, history, activities, or beliefs that a reasonable person in Plaintiff's position would find the material highly offensive.

205.    Defendant's sharing of the information was done in a manner that made the content substantially certain to become public knowledge.

206.    In sharing such information, Defendant gave publicity to a matter concerning Plaintiff which was false.

207.    Defendant either knew the publicized information was false and would place Plaintiff in a false light or acted with a reckless disregard as to whether it was false and would create a false impression.

208.    Defendant's e-mails were the cause of Plaintiff's injuries, damages, and losses.

209.    As a result of Defendant's actions, Plaintiff demands judgment for any actual damages which exceeds the jurisdictional limits of all lower courts which would have otherwise have jurisdiction of this matter, together with damages for pain and suffering and punitive

damages, attorney's fees, costs of this litigation and such other relief as the Court deems equitable and just.

## FOURTH CAUSE OF ACTION
### (Publicity Given to Private Life)

210.    Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

211.    Defendant publicized matters relating to Plaintiff's private life which would be highly offensive to a reasonable person and which are not of legitimate concern to the public.

212.    Such information includes, but is not limited to, Plaintiff's medical history and diagnoses, as well as photographs of Plaintiff's medical records.

213.    At a minimum, Defendant Ingber disclosed such images and information to Plaintiff's mother and sister.

214.    Defendant did not have Plaintiff's permission to publicize the information shared.

215.    Defendant's dissemination of the information was the cause of Plaintiff's injuries, damages, and losses.

216.    As a result of Defendant's actions, Plaintiff demands judgment for any actual damages which exceeds the jurisdictional limits of all lower courts which would have otherwise have jurisdiction of this matter, together with damages for pain and suffering and punitive damages, attorney's fees, costs of this litigation and such other relief as the Court deems equitable and just.

## FIFTH CAUSE OF ACTION
### (Aiding and Abetting)

217.    Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

218.    During the course of the parties' relationship, Ingber often said to Plaintiff "when you have money anything can be done for you."

219.    Due to the timing of some of the phone calls and text messages received by Plaintiff she has reason to believe that Defendant paid third parties - described herein as JOHN DOES 1-99 - to assist him in effectuating his scheme.

220.    Upon information and belief, Ingber requested or paid JOHN DOES 1-99 to send anonymous text messages, initiate phone calls using spoofed numbers, hack into and access Plaintiff's devices, monitor Plaintiff's devices and otherwise assist him in harassing Plaintiff.

221.    Ingber and JOHN DOES 1-99 recognized and understood that the other was providing substantial assistance in harming Plaintiff and furthering Defendant Ingber's general scheme to cause her personal and reputational harm.

222.    From the inception of the plan to current day, Defendant understood that some of the allegations he and JOHN DOES 1-99 were making about Plaintiff were false, that some of the messages invaded Plaintiff's medical privacy, and that disseminating Plaintiff's intimate content would cause her harm, but did so anyway for the sole purpose of causing her such harm.

223.    As a result of Defendant's actions, Plaintiff demands judgment for any actual damages which exceeds the jurisdictional limits of all lower courts which would have otherwise have jurisdiction of this matter, together with damages for pain and suffering and punitive

damages, attorney's fees, costs of this litigation and such other relief as the Court deems equitable and just.

## SIXTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

224.    Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

225.    Defendant engaged in the intentional, extreme, and outrageous conduct which, as described above, included secretly recording Plaintiff at home, in her car, and online and, later, convincing Plaintiff she was being investigated by New Jersey government officials to intimidate and scare her into remaining in a romantic relationship with him and hiring private investigators to further support this fabricated story.

226.    When this scheme failed, Defendant Ingber engaged in a campaign to destroy Plaintiff's reputation and relationships with friends, family, and colleagues by disseminating her intimate content and medical diagnoses.

227.    Defendant's unlawful surveillance together with his emotional and financial abuse, and ongoing harassment during and following the parties' breakup, in addition to all the other actions described above was so extreme in degree and so outrageous in character that it goes beyond all possible bounds of decency.

228.    Defendant Ingber's sole purpose in undertaking this behavior was to harass and/or embarrass Plaintiff.

229.    Defendant was made explicitly aware that Plaintiff did not consent to his secret recordings when Plaintiff first realized he was recording her through a gifted white clock in or about 2018.

230.    Defendant Ingber intended to cause severe emotional distress or recklessly disregarded the likelihood that his conduct would tend to cause severe emotional distress.  Such outrageous behavior is beyond the limits of decency and is intolerable in a civilized society.

231.    As a direct and proximate result of Defendant's harassment, Plaintiff suffered severe emotional distress for which she sought, underwent, and continues to undergo psychological treatment.

232.    Plaintiff feels a deep sense of shame that the private moments and medical facts Defendant Ingber shared about her have been seen by members of her family as well as friends and colleagues.  Plaintiff's once bright and outgoing personality has been forever dimmed by Defendant and she now approaches the world with a newfound skepticism and sadness due to Defendant's deception and abuses.

233.    Defendant acted with the intent to cause severe emotional distress, or alternatively, disregarded the substantial probability that his actions would cause severe emotional distress.

234.    Here, the acts of the Defendant were so egregious and were done so clearly with malice and/or reckless indifference in the face of a perceived risk that his actions would harm Plaintiff's reputation and mental wellbeing, that, in addition to all the damages inflicted upon Plaintiff and in addition to all the measure of relief to which Plaintiff may properly be entitled herein, Defendant should also be required to pay punitive damages to punish him for his reckless conduct in the further amount greater than the jurisdictional limit of all lower courts to be determined by the trier of fact, in order to deter him and others similarly situated from engaging in such conduct in the future.

235.    Plaintiff demands judgment against Defendant in an amount to be determined upon the trial of this action; said amount being sufficient to compensate Plaintiff for her severe injuries as well as an amount sufficient to punish Defendant for his willful, wanton, reckless, and unlawful conduct constituting a complete and reckless disregard for Plaintiff, together with interest, attorneys' fees, costs, and disbursements in this action; and said amount exceeding the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

## SEVENTH CAUSE OF ACTION
### (Civil Rights Law 52-b)

236.    Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

237.    Plaintiff had a reasonable expectation that the images, when taken, would remain private.

238.    The images disclosed by Defendant depicted Plaintiff engaging in sexual conduct.

239.    Defendant disseminated and published Plaintiff's intimate images without Plaintiff's permission or consent.

240.    The images were shared for the purpose of harassing, annoying or alarming Plaintiff.

241.    As a result of Defendant's actions, Plaintiff demands judgment for any actual damages which exceed the jurisdictional limits of all lower courts which would have otherwise have jurisdiction of this matter, together with damages for pain and suffering and punitive damages, attorney's fees, costs of this litigation, injunctive relief preventing Defendant from disseminating the images, and such other relief as the Court deems equitable and just.

## EIGHTH CAUSE OF ACTION
**(Harassment – N.Y. Civil Rights Law § 79-n)**

242.    Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

243.    Defendant intentionally selected Plaintiff for harm, caused her reputational damage, and subjected her to harassment by engaging in a course of conduct or by repeatedly committing acts which placed Plaintiff in reasonable fear of her physical safety.

244.    Defendant selected Plaintiff for such injury due to her gender, sexual orientation, and/or age.

245.    Defendant's actions have placed Plaintiff in reasonable fear of her physical safety, causing her damage.

246.    Plaintiff demands judgment against Ingber in an amount to be determined upon the trial of this action; said amount being sufficient to compensate Plaintiff for her severe injuries as well as an amount sufficient to punish Defendant Ingber for his willful, wanton, reckless, and unlawful conduct constituting a complete and reckless disregard for Plaintiff, together with interest, attorneys' fees, costs, and disbursements in this action; and said amount exceeding the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

## NINTH CAUSE OF ACTION
**(Intentional or Negligent Transmission of a Sexual Disease)**

247.    Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

248.    Defendant intentionally or negligently transmitted a sexually transmitted disease –
specifically Herpes Simplex Virus II – to Plaintiff when he engaged in unprotected sexual
relations with her.

249.    Defendant Ingber owed Plaintiff a duty of care not to transmit a sexual disease to
her which he breached, causing her to contract a sexually transmitted disease.

250.    Prior to engaging in sexual relations with Plaintiff, Defendant knew or should
have known that he had Herpes Simplex Virus II and breached his duty to inform her of his
status.

251.    Plaintiff learned that Defendant Ingber knew he had Herpes Simplex Virus II
when he sent her a copy of his ex-girlfriend's psychiatric evaluation from 2015 which stated, in
part, "she contracted genital herpes and apparently passed it on to another customer, a lawyer
from Long Island, who had been supportive of her…studies and career.  This apparently caused a
crisis and around the same time she also started a romantic relationship with the lawyer, which,
with interruptions, has continued until the time of this evaluation."

252.    While Plaintiff has reason to believe that Ingber gave his ex-girlfriend herpes, not
the other way around, in either event Defendant Ingber was aware he had herpes as late as 2015
and nevertheless coerced Plaintiff into engaging in unprotected sexual intercourse with him
without disclosing his diagnosis.

253.    Plaintiff demands judgment against Ingber in an amount to be determined upon
the trial of this action; said amount being sufficient to compensate Plaintiff for her severe injuries
as well as an amount sufficient to punish Defendant Ingber for his willful, wanton, reckless, and
unlawful conduct constituting a complete and reckless disregard for Plaintiff, together with

interest, attorneys' fees, costs, and disbursements in this action; and said amount exceeding the

jurisdictional limits of all lower courts which would otherwise have jurisdiction.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in their favor and against Defendant, containing the following relief:

A.    An award of damages against Defendant in an amount to be determined at trial, but not less than $150,000.00 per an intimate image and video shared, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her emotional distress;

B.    An injunction and order permanently restraining Defendant from disseminating Plaintiff's intimate images and videos without her permission or consent;

C.    An award of punitive damages, and any applicable penalties and/or liquidated damages in an amount to be determined at trial;

D.    Prejudgment interest on all amounts due;

E.    An award of costs that Plaintiffs have incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiffs' reasonable attorneys' fees and costs to the fullest extent permitted by law; and

F.    Such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
         September 30, 2025

Respectfully submitted,

**Veridian Legal P.C.**

 _/s/ Daniel Szalkiewicz_____
By:    Daniel S. Szalkiewicz, Esq.
        Cali P. Madia, Esq.
23 West 73rd Street, Suite 102
New York, NY 10023
Telephone: (212) 706-1007
Facsimile: (646) 849-0033
daniel@veridianlegal.com
*Attorneys for Plaintiff*